RECEIVED
IN ALEXANDRIA, LA

JUN 21 2006

ROBERT H. SHEMWELL, CLERK
WESTERN DISTRICT OF LOUISIANA

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

MONROE DIVISION

HUBERT D. WALKER,                         CIVIL ACTION
        Petitioner                 NO. CV03-2284-M

VERSUS

BURL CAIN, WARDEN,                        JUDGE ROBERT G. JAMES
        Respondent                 MAGISTRATE JUDGE JAMES D. KIRK

REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE

     Before the court is a petition for writ of habeas corpus filed
pursuant to 28 U.S.C. § 2254 by pro se petitioner Hubert D. Walker
("Walker") on December 15, 2003. Walker is contesting his 1999
conviction, by a jury in the Louisiana Sixth Judicial District
Court, Madison Parish, on one count of second degree murder; Walker
was convicted for killing Josephine Johnson in June 1997. Walker
was sentenced to life imprisonment and is presently incarcerated in
the Louisiana State Penitentiary in Angola, Louisiana. Walker has
four claims remaining, since his other claims were previously
dismissed (Doc. Item 26); the remaining claims are as follows:

    1. The evidence was insufficient to support Walker's
    conviction for the second degree murder of Josephine
    Johnson.

    2A. The trial judge allowed the introduction of
    inadmissible other crimes evidence through the testimony

of Shearricee Williams.

3. The trial judge allowed the introduction of inadmissible hearsay evidence.

1D. Walker had ineffective assistance of counsel through counsel's failure to cross-examine Michael C. Stelly.

The Respondent answered the petition (Doc. Item 24). Walker's habeas petition is now before the court for disposition.

## Facts

The facts of this case, as set forth on direct appeal by the Louisiana Court of Appeal, Second Circuit, at State v. Walker, 34-107 (2d Cir. 1/24/01), 778 So.2d 695, writ den., 2001-0783 (La. 1/25/02), 806 So.2d 669, are as follows:

> "The defendant and the victim lived together in an apartment in Vicksburg, Mississippi where the victim was employed at the Isle of Capri Casino. The victim was last seen alive on Friday, June 13, 1997. Her badly decomposed body was found on Monday, June 16, 1997, in a bar pit next to the Mississippi River by a man inspecting his leased hay field near the levee at the Madison Parish Port near Tallulah, Louisiana. The body was identified by forensic examiners based upon a description of the location and content of a tattoo the victim's brother had given her and by the gap between her front teeth along with clothing and jewelry known to be the victim's. The forensic experts testified that the cause of death was a stab wound through the victim's left cheek which penetrated back to and cut across her neck vertebrae. According to the experts, that wound by itself would have been fatal, but there was also the possibility that the victim was alive when placed into the water and subsequently drowned.

> "Isle of Capri Supervisors
> "Marion Hill, a cage shift supervisor at the Isle of Capri, testified that Josephine Johnson was employed as an on-line cashier. About four p.m. on Friday, June 13, 1997, Hill received a phone call from Josie stating that she would be late for work because someone had borrowed

her car and not returned it yet. Another cage shift supervisor, Monica Washington, testified that Josie called back about 5 pm to report that she would be unable to come to work because someone still had her car.

"Richard Brown
"Richard Brown testified that he was employed on June 13, 1997, as a supervisor at Complex Chemicals located at the Madison Parish Port, approximately eight miles north of Tallulah, La. At approximately 5:30 pm he passed a silver colored car occupied by two, possibly three, people including a bushy headed man with a mustache who was driving. Brown also identified a photo which he stated looked very similar to the individual he saw driving the car.

"Ricky Eastman
"Ricky Eastman stated that he was employed as truck driver at Madison Farm Supply which had fertilizer tanks at the Madison Parish Port. After 5 pm on June 13, Eastman drove over the levee and noticed a 'bright colored' car and a black man and black woman. After he loaded his truck and was leaving, he again saw the man and woman walking on the levee.

"Carlton R. Whitaker
"Employed by Madison Farm Supply on the date in question, Carlton R. Whitaker testified that he was waiting for a late truck to load after 5 pm. He observed two African-American persons who were engaged in a loud boisterous argument across the levee. Since he had some time before the late truck arrived, he went in his truck across the levee to fish. He got a good look at the man and woman who continued arguing. When he heard the truck arrive, he returned to his place of employment to load the truck after which he went home. He did not see the couple again. When presented a photo line-up, Whitaker selected two photos that most closely resembled the man he had seen. Whitaker informed the officers he would like to see a live line-up and to see them walking because the man had been walking the whole time Whitaker observed him. Subsequently he observed a live line up at the DA's office which was adjourned. The next day Whitaker saw another live line-up at the jail and again selected the two who most looked like the man he had seen. Whitaker was taken across the street and observed the six people walking. Based on the man's profile and gait, Whitaker identified Hubert Walker as the man he had seen on the

3

levee.

"Lillian Walker
"Lillian Walker testified pursuant to an agreement with
the state that she would be granted immunity from
prosecution in connection with this offense as long as
she testified truthfully. Mrs. Walker testified that
Hubert Delaney Walker, the defendant, was her son. Mrs.
Walker called her son 'Dee' and other family members
referred to him as 'Dee' or Delaney.

"On June 13, 1997, her son and Josie, the victim, came by
her house and ate catfish. Josie asked Mrs. Walker
questions about Shearricee, another of defendant's
girlfriends. Dee and Josie left when Josie said she had
to go to work. Mrs. Walker went to Jackson with one of
her daughters, Cassandra Faye Bryant, to pick up
Cassandra's daughter, Lakeelee, who was on a pass from a
mental health care center. The three returned to Mrs.
Walker's home around five in the evening. The defendant
arrived sometime later with wet feet and pants which he
explained by stating he had been washing a car. He left
after a short period of time.

"Defendant returned to his mother's home sometime after
midnight but before 3 or 4 am. Mrs. Walker stated he went
back to his bedroom moving fast like he was high on
drugs. Defendant told her: 'Mama, I think I done
something you ain't gon' be proud of.' When she asked,
defendant stated, 'I think I killed Josie.' Mrs. Walker
told him not to lie and he replied that the less she
knew, the better. He left her home. Mrs. Walker
acknowledged the possibility that she may have called the
police that night about the matter.

"She also testified she and her daughter, Cassandra,
discussed going to look for Josie. In an effort to locate
Josie, she also said she went to the apartment building
where her son and Josie lived together and called out for
them both from the parking lot because she did not know
which apartment was theirs.

"Michael Bryant
"A Vicksburg police officer, Michael Bryant, testified
that he was on duty in the early morning hours of June 14
when he received a call about 2 am from a woman who asked
what to do if someone had stated he had killed someone.
Bryant told her it should be reported and asked if

4

someone had told her that. The caller replied: 'Yes, my son. My son, Hubert Walker, said that he had killed somebody.' When asked who, the caller stated 'He's killed his girlfriend, Josephine Johnson.' When asked where, the caller stated she was not sure, but thought the Deville Apartments (in Vicksburg). The caller hung up when asked for her name.

"Bryant looked though the department's records because someone previously arrested would have a next of kin listed. Bryant found some numbers on Hubert Walker. They tried to call the numbers listed but never located anyone. When he received a call on Monday from the Warren County Mississippi Sheriff's Office that the victim's body had been found, Bryant related to that department the information about the phone call. On cross-examination, Bryant stated he did not know who called.

"Deverick Hicks Watson
"Testifying that friends and family called her 'Pig,' Deverick Hicks Watson stated she knew the Walker family including Cassandra, Lakeelee, defendant whom everyone called 'Dee' and his mother. Watson stated she was at the Walker home between five and six with a number of family members and was there when the defendant came home wearing wet pants.

"Shearricee Williams
"Testifying that she used to live with the defendant, Williams stated she was seeing Dee around June 13, 1997, but he was at that time living with Josie. He came to her house sometime before 8:30 on that evening and they fixed drinks. He stated to her, 'Well, she's gone.' When she asked if Josie had gone to Louisiana, defendant replied yes. Defendant then asked her to marry him and said they would have to marry before Monday. Shearricee testified she accepted the proposal. They went to his mother's home where they visited and continued drinking with his family members. Sometime later, she, defendant and his niece, Lakeelee, went to the County Market. They returned to his mother's where many of the family were gathered. While defendant was holding his sister's baby, she noticed that defendant was crying.

"On their way to her home on Friday night, she went with defendant to Josie's apartment in the Deville Apartments for the defendant to get his things. When defendant

stated that Josie was not coming back, Shearricee asked if she could have some statues. The defendant told her to take what she wanted and she took three little statues and two fancy glasses. She and the defendant returned to her home and went to bed. Admitting she was 'pretty loaded by then,' she did not know if the defendant went out later.

"The witness stated that she picked up from Mrs. Walker's home at Dee's request a pair of damp boots which she placed into a plastic bag. The defendant removed those boots from Shearricee's house on Saturday and stated 'They can't stay here.' On Saturday afternoon, Shearricee went through the defendant's wallet which he had left at her house. She said it was damp and contained no money. Shearricee found a pawn ticket which she hid. When asked why she was going through his wallet, Shearricee responded that the defendant had stolen the VCR he had given her for Valentine's Day and she wanted it back. When asked if the pawn ticket stated it was for a VCR, Shearricee responded the ticket said 'gold chain, but he had stole a gold chain from me, too.'

"Julius Williams
"Julius Williams testified that at the time of trial he was residing in a drug recovery center where he was seeking to overcome a thirteen year addiction to crack cocaine. In June 1997 Williams lived in Vicksburg, Mississippi with Sharon Michelle. Late on the night of June 13 or early in the morning of June 14, the defendant who was driving a light colored Mazda picked up Williams and his girlfriend as they were walking to a store to buy beer. Defendant wanted their assistance in selling a television and VCR in the car. They drove to the trailer of a man Sharon knew. While she was inside discussing the potential sale, the defendant and Williams remained in the car. The defendant told Williams that he had 'f____ed up, that he had killed this b____ that he was living with.' Defendant inquired if Williams knew somewhere to get rid of the car for some quick cash because he wanted to get out of town. Defendant said something to Williams about going to California.

"Williams testified that Sharon was not successful selling the items at the first stop, but at the next stop, she sold the VCR for $40. The trio returned to Vicksburg and brought crack cocaine. They went to Williams' apartment and got high. Toward morning, Sharon

left with the defendant to go back to the deceased's
apartment to get more items for Sharon to help defendant
sell and to see if Sharon wanted anything.

"Ernie Duncan
"The defendant's sister and the daughter of Lillian
Walker, Ernie Duncan testified that she resided in Long
Beach, California during June 1997. On Saturday June 14,
she received a phone call from Lakeelee Bryant, her
niece, who was upset and informed her that the defendant
(Duncan's brother and Lakeelee's uncle) had done
something pretty bad pertaining to Josie. Ernie told
Lakeelee to get off the phone so she could call her
brother at her mother's home in Vicksburg. When she
asked, the defendant said 'no, but he had to do what he
had to do.' Later that night the defendant phoned Ernie
and told her 'they had gotten into it, but he said, you
know, he hadn't seen her anymore.' On Sunday he called
Ernie to tell her not to worry because nothing had
happened and he was high last night.

"Ernie said that the defendant did not sound good and she
repeatedly asked him what had happened. The defendant
stated it was all taken care of, but he denied killing
Josie. When Ernie asked if he had hurt Josie, the
defendant responded that 'She got what she deserved.'
Ernie thought he was high and talking out of his head.
Ernie acknowledged telling an investigator in California
that the defendant told her:
    'Small things is small things, and what had to
    be done had to be done, and if anybody else
    calls you, you don't know anything.
    'Josie deserves what she got. She thought that
    I was going to do her wrong. They thought that
    I was going to kill her in the house, but she
    thought I was gonna kill her in the house. It
    didn't work like that. I took her out. She
    tried to get away. She couldn't get away. The
    only thing that I can say is that she got what
    she deserved.'

"Cassandra Faye Bryant
"Another sister of the defendant and the mother of
Lakeelee Bryant, Cassandra testified that on June 13,
1997 Cassandra and her mother had been to the mental
hospital in Jackson to pick up Lakeelee for a weekend
visit. Cassandra testified that Lakeelee was diagnosed
paranoid schizophrenic. Cassandra dropped off her mother

7

and Lakeelee at Mrs. Walker's home around 7:30 in the evening and she returned about 8 pm. That evening she made plans with her mother to go look for Josie because Lakeelee had told her that defendant had killed Josie. They called Josie's relatives in Louisiana looking for her and Josie's place of employment. They learned Josie had not been at work that day.

"Mrs. Walker told Cassandra that defendant had told her how he had killed her and what he did with the body. Cassandra's fiancé told them they could be charged as accessories if they found the body so they did not search. During the course of the weekend, Lakeelee because so upset about what the defendant had told her about killing Josie that Lakeelee had to be hospitalized. Cassandra stated she called the Vicksburg police and reported that the defendant had told Lakeelee that he had killed his girlfriend.

"Wayne Stutts
"A DA's investigator on June 13, 1997, Wayne Stutts testified he assisted in the investigation of the Josie's murder. He identified numerous photos he took of the scene, the victim's body and the pieces of the murder weapon. He also corroborated Whitaker's testimony about the photographic line-up in which Whitaker selected the two photos most closely resembling the person and requested an opportunity to see a live line-up with the men walking. He identified the defendant as the primary person. At the later live line-up, he chose the same two subjects with the defendant again being his first choice. When Whitaker saw the participants of the line-up walk, Whitaker positively identified the defendant as the man he had seen on the levee. Stutts also testified that the victims' pants pockets had been turned inside out when the body was found. In addition to recovering three dollar bills from the water near the body, Stutts testified that Lakeelee reported that the defendant (her uncle) told her to get a five dollar bill from under the sun visor in Josie's car. Lakeelee stated that the money she found was wet.

"In questioning the defendant, Stutts testified that the defendant told him that he and Josie had problems before, that he had held her hostage before. The defendant wept and also stated 'I really f___d up, didn't I?' The defendant told Stutts if he could speak to his mother, defendant would tell Stutts everything he needed to know

about the murder. After defendant's mother left, defendant denied committing the murder.

"Phillip Demeranville
"A patrol officer with the Vicksburg police, Phillip Demeranville testified that on May 13, 1997, the victim came to the police department to file a complaint against the defendant whom she described as insanely jealous and constantly following her. The victim stated she was scared of the defendant.

"Jackie Johnson
"Jackie Johnson testified that she was a Vicksburg patrol officer on May 20, 1997, when a call to 911 by Frenchette Johnson reported that her mother was being held captive in a bedroom at 1213 Openwood in Vicksburg. Police policy on domestic violence calls was to get a criminal history on the accused. When police learned that the defendant was inside and that he had a long criminal history from 1975, the supervisor sent other units to the scene. Defendant's criminal record included five assaults with a deadly weapon, aggravated battery, drug charges, and robbery.

"When officers entered they found Josephine McKinney in bed with the defendant in a residence that showed signs of a struggle. The officers also found drug paraphernalia and notified his probation officer. The officer identified a photo of the victim as the person known to her as Josephine McKinney. She also identified the defendant as the man in the apartment that night with the victim. Because the woman had an injured lip and physical bruises, the defendant was arrested that night. In response to cross-examination, the officer stated that the defendant was found guilty of this charge and given thirty days.

"Steven McCraney
"Defendant's probation officer, Steven McCraney, testified that defendant received a twelve year sentence for burglary and grand larceny which was suspended. Defendant served one year in jail and then was released to five years supervised probation. During a discussion about whether the defendant was going to agree to be extradited to Louisiana, McCraney stated the defendant told him, 'I guess I'm gonna go ahead and gon' on back to Louisiana, but they are going to have to saddle up their horse and they gon' to have to ride it because they gon'

have to prove everything. I'm not going to tell 'em anything.' In response to cross-examination, McCraney testified that two drug tests on defendant were positive in May and June 1997.

"Frenchette Johnson
"Frenchette Johnson testified that she was the daughter of Josephine Johnson McKinney, the victim. A college student in California, Frenchette and her two year old nephew flew to Louisiana in May 1997 to visit her grandparents and other relatives in Maringouin and her mother in Vicksburg. Frenchette recounted an outing to Tallulah where the defendant showed them various places in the town where he had grown up. The defendant also took them to pick berries in sight of the levee at the Madison Parish Port. Frenchette stated that her mother owned two cars, a champagne light colored Mazda and a blue Honda Accord. Frenchette testified that on a night in May, 1997 Josie gave her a note to quietly call the police after the defendant went to sleep because he had hit her and would not let her leave the house. Frenchette complied and the police arrested defendant. The next day she and her mother inventoried and packed up her mother's belongings and went to Josie's mother's home in Maringouin. Shortly, thereafter Frenchette returned to California.

"Sometime after Frenchette returned to California, her mother returned to live in Vicksburg when she got a job at the Isle of Capri Casino. Frenchette's last conversation with her mother was on the Wednesday before Friday, June 13, 1997. At trial Frenchette identified the knife and the matching broken knife found at the murder scene as belonging to her mother. Frenchette also identified as her mother's property the statues and glasses Shearricee had taken from the victim's apartment. In addition, she testified that many electrical appliances were missing when she and her family got her mother's property. Frenchette also identified the ring and watch removed from the victim's body as those belonging to her mother.

"Kirk Knowles
"Louisiana State Trooper Kirk Knowles testified that in the early morning hours of Saturday, June 14, 1997 a caller to the Vicksburg police identifying herself as Hubert Walker's mother stated that her son had killed Josie Johnson. A check of phone records revealed that the

call had been made from the residence of Isaac Branch, the husband of Lillian Walker, defendant's mother. In the first interview with the defendant in which officers sought information from the defendant about the victim's whereabouts, defendant told the officer that if they found the blue car, they would find Josie."

## Rule 8(a) Resolution

This court is able to resolve the merits of this habeas corpus petition without the necessity of an evidentiary hearing because there is no genuine issue of material fact that is relevant to the petitioner's claims, and the State court records provide the required and adequate factual basis necessary to the resolution of the habeas corpus petition. Moya v. Estelle, 696 F.2d 329, 332-33 (5th Cir. 1983); Easter v. Estelle, 609 F.2d 756, 761 (5th Cir. 1980); Habeas Corpus Rule 8(a).

## Standard of Review

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall be considered only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a).

Under 28 U.S.C. § 2254 and AEDPA, which is applicable to habeas petitions filed after its effective date on April 24, 1996, habeas relief is not available to a state prisoner with respect to a claim that was adjudicated on the merits in the State court proceedings unless the adjudication of the claim (1) resulted in a decision that was *contrary to*, or involved an *unreasonable*

*application of,* clearly established Federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an *unreasonable determination* of the facts in light of the evidence presented in the State Court proceeding. Therefore, pure questions of law and mixed questions of law and fact are reviewed under Section 2254(d)(1), and questions of fact are reviewed under Section 2254(d)(2). <u>Martin v. Cain</u>, 246 F.3d 471, 475-76 (5th Cir. 2001), cert. den., 534 U.S. 885, 122 S.Ct. 194 (2001), and cases cited therein.

A state court decision is "contrary to" clearly established Supreme Court precedent if the state court applies a rule that contradicts the governing law set forth in Supreme Court cases, or confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a result different from Supreme Court precedent. A state court decision falls within the "unreasonable application" clause when it unreasonably applies Supreme Court precedent to the facts. <u>Martin</u>, 246 F.3d at 476, and cases cited therein.

A federal habeas court making the unreasonable application inquiry should ask whether the state court's application of clearly established federal law was objectively reasonable. A federal court cannot grant habeas relief simply by concluding that the state court decision applied clearly established federal law erroneously; the court must conclude that such application was also

12

unreasonable.  Martin, 246 F.3d at 476, and cases cited therein.

Law and Analysis

Ground No. 1 - Insufficient Evidence

Walker contends there was insufficient evidence to support his conviction for the second degree murder of Josephine Johnson. Walker contends that only a little circumstantial evidence, unsupported by any physical evidence, supports his conviction. Specifically, Walker argues there was insufficient evidence to identify him as the person who murdered Josephine Johnson.

A reviewing court confronted with a claim of insufficient evidence must, after viewing all the evidence in the light most favorable to the conviction (prosecution), determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Cupit v. Whitley, 28 F.2d 532, 542 (5th Cir. 1994), cert. den., 513 U.S. 1163, 115 S.Ct. 1128, 130 L.Ed.2d 1091 (1995), citing Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). A jury's determination of witness credibility, the inferences made on the evidence, and the jury's reasonable construction of the evidence are entitled to a great deal of deference by a reviewing court.  Marshall v. Lonberger, 459 U.S. 422, 433-35, 103 S.Ct. 843, 850-51 (1983).  In addition, where there has been a thoughtful review of the sufficiency of the evidence by a state appellate court, that court's findings are entitled to great weight.  Jackson, 443 U.S.

13

at 322 n.15, 99 S.Ct. at 2790 n.15. In the case at bar, Walker was tried and convicted by a jury (Doc. Item 1) and the Louisiana Second Circuit Court of Appeal considered and rejected Walker's claim of insufficient evidence (Tr. p. 989).

Habeas relief on a claim of insufficient evidence is appropriate only if it is found that, upon the record evidence adduced at trial, no rational trier of fact could have found proof of guilt beyond a reasonable doubt. West v. Johnson, 92 F.3d 1385 (5th Cir. 1996), cert. den., 520 U.S. 1242, 117 S.Ct. 1847, 137 L.Ed.2d 1050 (1997), citing Jackson v. Virginia, 443 U.S. at 322-26, 99 S.Ct. at 2791-92. To apply this standard, the court looks to elements of the offense as defined by state substantive law. Donahue v. Cain, 231 F.3d 1000, 1004 (5th Cir. 2001).

To prove second degree murder in this case, the state was required to show (1) the killing of a human being, and (2) that the defendant had the specific intent to kill or inflict great bodily harm. LSA-R.S. 14:30.1 A(1). Specific intent is "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." LSA-R.S. 14:10(1). Specific intent is a state of mind, and may be inferred from the circumstances and actions of the accused or from the extent and severity of the victim's injuries. State v. Packnett, 04-709 (La.App. 5 Cir. 12/28/04), 892 So.2d 615, 619, writ denied, 05-0599 (La.6/3/05),

903 So.2d 455. It may be inferred from the circumstances of the transaction and the actions of the defendant. State v. Graham, 420 So.2d 1126 (La. 1982). The determination of whether the requisite intent is present in a criminal case is for the trier of fact. State v. Huizar, 414 So.2d 741 (La. 1982).

In addition to proving the statutory elements of the charged offense at trial, the State is required to prove the identity of the perpetrator. State v. Searls, 04-790 (La.App. 5 Cir. 1/25/05), 895 So.2d 40, 43. When a key issue at trial is whether the defendant was the perpetrator of the crime, the State is required to negate any reasonable probability of misidentification in order to carry its burden of proof beyond a reasonable doubt. State v. Smith, 430 So.2d 31, 45 (La. 1983). See also, State v. Brady, 414 So.2d 364, 365 (La. 1982); State v. Long, 408 So.2d 1221, 1227 (La. 1982). The factors to be considered in assessing the reliability of an identification include opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the prior description of the criminal, the level of certainty displayed at the confrontation, and the time between the crime and the confrontation. Manson v. Brathwaite, 432 U.S. 98, 114, 97 S.Ct. 2243, 2253 (1977); State v. Winfrey, 97-427 (La. App. 5 Cir. 10/28/97), 703 So.2d 63, writ denied, 98-0264 (La. 6/19/98), 719 So.2d 481.

Richard Brown testified that he saw at least two people, male

and female, sitting in the front seat of a silver car on the evening of Friday, June 13, 1997 (the night the victim disappeared) from about 200 yards away (Tr. pp. 502-503, 505-508); the male driver was bushy-headed with a mustache (Tr. p. 506). Brown further testified that the pictures of the victim's car and of Walker were very similar to the car and driver he saw that night (Tr. pp. 508, 511).

Ricky Eastman testified that, at about 5 p.m. on Friday, June 13, 1997, he saw a light colored car similar to the victim's on the levee and saw a black man and a black woman standing on the levee with their backs to him (Tr. pp. 524, 529); later, he saw them walking toward the car (Tr. p. 528). Eastman testified that the woman was wearing what appeared to be an Isle of Capri shirt (the victim's place of employment) (Tr. p. 532).

Carlton Whitaker testified that, sometime after 5:00 p.m. on Friday, June 13, 1997, he was sitting in the elevated loading tower at Madison Farm Supply, near the levee, when he saw a black man and a black woman walking over the levee toward the river, about 150 yards from him, and heard them arguing loudly (Tr. pp. 538-539). Whitaker testified that he listened to the couple argue, sometimes loudly and with profanity, for about fifteen minutes, then he drove to the river to fish for about thirty minutes (Tr. p. 539). On the way to his fishing spot, Whitaker passed the couple and "got a very good look at both individuals" from about sixty yards away (Tr.

pp. 540, 548). When Whitaker returned to the tower about thirty minutes later, he again saw the couple on the levee (Tr. p. 541). The victim's body was found on Monday, June 16, 1997 (Tr. p. 542). A few days later, when the police were investigating the matter, Whitaker told the police he had seen a woman who was about 5'5" or 5'6" tall, weighed about 160 or 170 pounds, and was wearing black pants, a pale green shirt and high top shoes, and a man who was wearing Bermuda shorts, a striped tee shirt and sandals (Tr. p. 543). Whitaker subsequently picked two photographs from a photographic lineup that most resembled the man he saw on the levee and stated the photograph of Hubert Walker was his first choice (Tr. pp. 545, 740-742). A few months later, Whitaker picked Hubert Walker from a live, walking lineup as the man who best resembled the man he saw on the levee (Tr. pp. 546, 547, 551).

Walker's mother, Lillian Walker, testified that Walker told her he thought he had killed Josephine Johnson (Tr. p. 580). Officer Michael Bryant of the Vicksburg City Police testified that, on June 14, 1997, Lillian Walker called the police and reported that her son, Hubert Walker, had told her he had killed his girlfriend, Josephine Johnson (Tr. pp. 600-601).

Deverick Watson testified that she saw Walker arrive at Lillian Walker's house late in the evening of June 13, 1997, and that his pants were all wet (Tr. pp. 610-611).

Shearricee Williams, Walker's other girlfriend, testified

that, on the evening of June 13, 1997, Walker told Williams that Johnson was "gone" and was not coming back; later, Walker started crying (Tr. pp. 619, 621, 628). Williams also testified that she picked up a damp pair of Walker's boots from his mother's house; he took the boots away in a plastic bag on Saturday morning, June 14, 1997, saying the boots could not stay there, at Williams' home (Tr. pp. 634, 636-637, 645-646). Williams further testified that she noticed Walker's wallet was damp on Saturday afternoon (Tr. p. 637). Williams also testified that Walker had a woman's blue leather coat and some boots in his possession after the night of the murder, which he took away (Tr. pp. 631-636).

Julius Williams testified that he saw Walker on the evening of June 13, 1997, at a convenience store, and that Walker told him he had "killed this bitch that he was living with" and he wanted to get rid of her car and some other things for quick cash (Tr. pp. 654-656). Williams further testified that Walker wanted to go to Johnson's apartment to get more things to sell (Tr. p. 658).

Walker's sister, Ernie Duncan, testified that Walker told her Johnson had gotten what she deserved (Tr. p. 682), and that Johnson thought he was going to kill her in the house and tried to get away but she couldn't and that he "took her out" (Tr. p. 691).

Another of Walker's sisters, Cassandra Faye Bryant, testified that, on Saturday, June 14, 1997, their mother told her Walker had admitted he killed Johnson and had told her where hd had left

Johnson's body (Tr. pp. 698-700). Bryant further testified that her daughter, Lakeelee Bryant, told her Walker had admitted to her, also, that he had killed Johnson, so Bryant contacted the police and reported it (Tr. pp. 701-703).

Officer Wayne Stutts testified that Lakeelee Bryant stated that, on the night of Friday, June 13, 1997, Walker told her to get a five dollar bill from the sun visor of Johnson's car; when she did, she found the bill and the passenger seat were both soaking wet (Tr. p. 790).

Officer Phillip Demeranville testified that, on May 13, 1997, Johnson filed a complaint against Walker, stating she was scared of him because he was "insanely jealous" and followed her everywhere (Tr. p. 795). Officer Jackie Johnson testified that, on May 20, 1997, he was one of the officers who responded to a call from Johnson's daughter, Frenchette Johnson. Officer Johnson testified that Walker had been beating Johnson and holding her hostage in her apartment; Walker was arrested (Tr. pp. 800-803). Frenchette Johnson also testified as to that incident (Tr. pp. 866-869). Frenchette further testified that Walker's brother, Alfredo, was found driving Johnson's car after Johnson's body was discovered (Tr. p. 876). Frenchette identified the kitchen knife found broken at the scene as one of Johnson's, as well as Johnson's blue leather jacket and boots which Walker had in his possession after Johnson was killed (Tr. pp. 876-878).

Walker argues there was no evidence to establish Johnson was killed on June 13, 1997, when she was seen with Walker, and points to the fact that her body was not discovered until June 16, 1997. However, Johnson was last seen on June 13, 1997, arguing with Walker, and her body was found on June 16 at the same place. It was not necessary to establish Johnson's exact time of death to prove the elements of the offense.

Walker also argues the evidence as to cause of death was inconclusive; however, the forensic pathologist's testimony, that the cause of death was either the fatal stab wound to her head or a combination of the stab wound and drowning (Tr. p. 834), was circumstantial evidence of Walker's guilt since it indicated Johnson died where she was last seen with Walker. Walker points out that no one saw him murder Johnson or commit any act of violence toward Johnson, and his fingerprints were not found on the murder weapon. However, neither eyewitness testimony nor fingerprints were required to prove the elements of the offense.

Walker's inculpatory statements to his family and friends were the evidence most indicative of Walker's guilt. Those statements, together with the circumstantial evidence of his having been seen with the victim in the same place where her body was found, and the fact that his clothes and his belongings were wet that night, are sufficient, when to viewed in the light most favorable to the conviction, to support his conviction. This ground for habeas

relief is meritless.

## Ground No. 2A - Shearricee Walker's Testimony

Next, Walker contends the trial judge allowed the introduction of inadmissible other crimes evidence through the testimony of Shearricee Williams.[1]

Mere violation of evidentiary rules by the state trial court does not in itself invoke habeas corpus relief. Panzavecchia v. Wainwright, 658 F.2d 337, 340 (5th Cir. 1981). Thus, claims challenging the exclusion or inclusion of evidence based on state law do not afford a basis for federal habeas corpus relief. Federal habeas corpus review is limited to errors of constitutional dimension, and federal courts do not sit to review the mere admissibility of evidence under state law. In reviewing state court evidentiary rulings, the federal habeas court's role is limited to determining whether a trial judge's error is so extreme that it constituted a denial of fundamental fairness under the Due Process Clause. Castillo v. Johnson, 141 F.3d 218, 222 (5th Cir.), cert. denied 524 U.S. 979, 119 S.Ct. 28 (1998), and cases cited therein.

The admission of improper evidence in a state criminal trial

---

[1] Walker also complains in his brief about other crimes evidence, from Walker's criminal history, introduced through the testimony of Officer Jackie Johnson (Tr. pp. 799-800) and Probation Officer Steven McCraney (Tr. pp. 810-811). Despite Walker's contention to the contrary, his criminal history was included in the Prieur notice (Tr. pp. 270-271).

will constitute grounds for habeas relief if fundamental fairness was prevented thereby. What elevates the mistake to a constitutional plane is at least two-fold. First, the mistake must be material in the sense of a crucial, critical, highly significant factor. Second, it must have some state complicity in it. Shaw v. Estelle, 686 F.2d 273, 275 (5th Cir. 1982), cert. den., 459 U.S. 1215, 103 S.Ct. 1215 (1983), and cases cited therein. Also, Hills v. Henderson, 529 F.2d 397 (5th Cir. 1976), cert. den., 429 U.S. 850, 97 S.Ct. 139 (1976).

Louisiana law generally prohibits the admission of "other crimes evidence," that is, evidence of criminal conduct uncharged in the subject indictment, with exceptions for proving identity, system or res gestae. Robinson v. Whitley, 2 F.3d 562, 566 (5th Cir. 1993), cert. den, 510 U.S. 1167, 114 S.Ct. 1197, 127 L.Ed.2d 546 (1994), citing State v. Prieur, 277 So.2d 126, 128 (La. 1973).

In Louisiana, evidence of other crimes can be admitted to show intent, knowledge or system, but not to show motive; the Fifth Circuit has held, in Webb v. Blackburn, 773 F.2d 646, 652 (5th Cir. 1985), that other crimes evidence introduced to show motive, in violation of Louisiana evidentiary rules, does not rise to the level of a constitutional violation.

Evidence of other crimes may also be admitted when it forms part of the res gestae of the charged offense. Robinson, 2 F.3d at 566. To constitute res gestae the circumstances and declarations

22

must be necessary incidents of the criminal act, or immediate concomitants of it, or form in conjunction with it one continuous action. In such cases the purpose served by admission of other crimes evidence is not to depict the defendant as a bad man, but rather to complete the story of the crime on trial by proving its immediate context of happenings near in time and place. Evidence which does not form part of the res gestae, but which merely depicts the defendant as a bad man, may constitute a due process violation if it renders the trial fundamentally unfair. See Robinson, 2 F.3d at 567. To constitute res gestae, the circumstances and declarations must be necessary incidents of the criminal act, or immediate concomitants of it, or form in conjunction with it one continuous action. Robinson, 2 F.3d at 567. No Prieur notice is necessary when the other crimes evidence sought to be introduced forms an integral part of the crime charged. State v. Broussard, 95-792 (La. App. 3d Cir. 12/6/95), 664 So.3d 835, 838.

Shearricee Williams ("Williams") testified at trial that she was dating Walker in June 1997, when he committed the offenses for which he was convicted (Tr. pp. 138-139). Williams testified that Walker was also living with the victim at that time. At about 8 p.m., on the evening of June 13, 1997, the date of the offense, Walker went to Williams' home, poured himself a glass full of gin, and told Williams the victim was "gone" and "wasn't coming back"

(Tr. pp. 618-619, 628); Williams asked if the victim had gone to Louisiana, and Walker told her yes (Tr. p. 619). Walker then asked Williams to marry him, and said it had to be "before Monday." Williams testified that she accepted the proposal and they went to his mother's house to tell his family (Tr. pp. 619-620). Williams testified that they were all sitting at Walker's mother's home, drinking, when Walker began crying (Tr. p. 621). Later, they left and went to Johnson's apartment for Walker to collect his things (Tr. p. 623). Walker allowed Williams to have some of the things in the apartment Johnson had shared with Walker, since Johnson would not be returning for them (Tr. pp. 629-630).

Williams further testified that, on the day the police asked to search her home, she allowed them to do so; since Walker wasn't there at the time and had left his wallet at her house, she went through his wallet because she believed he had taken a VCR that he had previously given her (Tr. pp. 637). Williams testified Walker's wallet was damp and empty except for a pawn ticket (Tr. pp. 637-638). Williams testified the pawn ticket was for a gold chain, which she believed Walker had "stolen" from her, so she hid the ticket (Tr. p. 638).

Walker moved for a mistrial, objecting to Williams' testimony that he had stolen the chain and a VCR from her and arguing it was inadmissible evidence of other crimes (Tr. p. 639). The State argued that the testimony as to the VCR had been ruled admissible

24

at the _Prieur_ hearing, and that Walker's pawn of the gold chain was part of the res gestae because it was an action taken to conceal his crime. Williams testimony as to the theft of her VCR was included in the state's _Prieur_ notice and found admissible after the hearing. Williams' testimony that Walker had "stolen" her gold necklace, given when the prosecutor was questioning her about the VCR, was unsolicited by the prosecutor; as found by the trial judge, the prosecutor did not intentionally elicit[2] the testimony as to the "other crime" theft of the necklace. The court held a mistrial was not required and that, in any event, the testimony was necessary to explain why Williams searched Walker's wallet; the fact that the wallet was damp was relevant to the case (Tr. pp. 642-643). Walker then waived having the trial judge admonish the jury regarding the testimony as to other crimes (Tr. pp. 644).

Walker's trial was not rendered "fundamentally unfair" by the testimony as to the theft of the necklace, since it clearly connected to Williams' testimony about her search of Walker's damp wallet, and since testimony that Walker took Williams' gold necklace was essentially irrelevant to the issue of whether Walker murdered Johnson. In light of all the evidence against Walker in this case, Williams' testimony as to Walker taking her gold necklace did not violate Walker's right to due process. Walker has not shown that the trial judge abused his discretion or committed

_____

[2] See La.C.Cr.P. art. 770.

an error so extreme that it denied William's constitutional right to a fundamentally fair trial. Therefore, Williams has not proven a constitutional violation cognizable in habeas corpus.

This ground for relief is meritless.

## Ground No. 3 - Hearsay

Next, Walker argues the trial judge allowed the introduction of inadmissible hearsay evidence when he permitted Ernie Duncan and Cassandra Bryant to testify as to statements made by Lakeelee Bryant. Walker contends that Lakeelee was available to testify. As explained above, in order to obtain habeas relief, Walker must show that admission of the hearsay testimony was material in the sense of a crucial, critical, highly significant factor, and that there was some state complicity in it.

Ernie Duncan, Walker's brother, testified that, on June 14, 1997, at about 9 p.m., he received a phone call from his niece, Lakeelee Bryant, who stated, over objection by the defendant, that Lakeelee told him Walker had "done something bad" to the victim (Tr. pp. 678-679). Ernie testified that he then called Walker and asked him if he had done something to the victim, which Walker denied, but also stated "he had to do what he had to do" (Tr. p. 679) and that "it was all taken care of" (Tr. p. 682). In another phone call that night, Walker told Ernie that he and the victim had "got into it" but he hadn't seen her anymore (Tr. p. 680). In a third phone call, the next morning, Walker again told Ernie he did

not know where the victim was (Tr. pp. 680-681). Walker denied killing the victim, but when Ernie asked if he had hurt the victim, Walker told Ernie "she got what she deserved" (Tr. p. 682).

Cassandra Bryant, Walker's sister and Lakeelee's mother (Tr. pp. 693-694), testified that Lakeelee told her that Walker had killed Johnson (Tr. p. 697, 701-702). Cassandra also testified that her mother, Lillian Walker, told her Walker had admitted he killed Johnson (Tr. pp. 698-699). Cassandra later contacted the police and gave them that information (Tr. p. 702).

Walker objected to the hearsay testimony as to what Lakeelee told Ernie and Cassandra because Lakeelee, who was seventeen years old at the time of trial,[3] was available to testify (Tr. p. 675, 703). The prosecutor responded that he was trying to avoid calling Lakeelee to testify (Tr. p. 676). Testimony by Cassandra Bryant, showed that Lakeelee suffers from "schizophrenic paranoia" and that, at the time Lakeelee told Ernie and Cassandra about Walker, she was living in a mental hospital but was allowed to spend weekends at home (Tr. pp. 694-695, 700).

The court admitted the hearsay testimony by Ernie and Cassandra on the basis that it merely showed why Lakeelee called them, as well as why Ernie then called Walker (Tr. pp. 677-678), but stated if the testimony became prejudicial to Walker, Lakeelee

---

[3] Lakeelee was fourteen years old at the time she called Ernie concerning Walker (Tr. p. 675).

could be called to testify and could be cross-examined (Tr. p. 678). Walker did not ask to cross-examine Lakeelee.

Since the hearsay testimony only showed why the witnesses, Ernie Bryant and Cassandra Bryant, contacted Walker concerning Johnson, Walker's trial was not rendered fundamentally unfair by its admission. The trial court's admission of the hearsay testimony did not result in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States.[4] Therefore, this ground for habeas relief is also meritless.

Ground 1D - Cross Examination of Michael C. Stelly

Walker further contends he had ineffective assistance of trial counsel through his attorney's failure to cross-examine prosecution witness Michael C. Stelly.

Stelly, who was employed by the North Louisiana Crime Lab, was

---

[4] In <u>Davis v. Washington</u>, ___ S.Ct. ___, 2006 WL 1667285, *6 (U.S. June 19, 2006), the Supreme Court recently held the Confrontation Clause of the Sixth Amendment is not violated by introduction of non-testimonial statements of a witness who did not appear at trial and who was not shown to be "unavailable" to testify, citing <u>Crawford v. Washington</u>, 541 U.S. 36, 53-54, 124 S.Ct. 1354 (2004). "It is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause."
In the case at bar, Lakeelee's statements to Cassandra and Ernie were not testimonial, nor were they necessarily reliable given her mental health problems at that time; they simply explained a step in the family's investigation of and report to the police about Johnson's possible murder by Walker.

accepted by the court as an expert in the areas of firearm identification, tool marks, and fingerprint identification (Tr. pp. 768-769). Stelly testified that three broken knife pieces found at the crime scene (Tr. pp. 240-251), which were all part of the same knife (handle and two blade pieces) and were similar enough to a knife from the victim's apartment (Tr. p. 878) to have come from the same set of knives (Tr. p. 776). Stelly further testified that latent prints were found on one of the blade pieces, but they did not match Walker's prints (Tr. pp. 777-779). Stelly testified that he compared the print to one other person, whom it also did not match (Tr. p. 778). Walker has not presented any evidence which contradicts Stelly's testimony, nor has he alleged or shown what testimony his attorney could have elicited on cross-examination which would have been helpful to Walker's case. Although Walker contends his attorney should have asked Stelly whether he determined whom the "unknown" fingerprint on the knife belonged to, the fact that Stelly did not testify the print was identified indicates he did not determine who left the fingerprint. Moreover, Stelly testified that, at the time the knife pieces underwent a prior examination by another analyst, a fingerprint analysis had not been requested, so Stelly did not know whether the previous analyst used gloves when handling the pieces. Moreover, Officer Stutts testified that either he or Deputy Donnell Rose could have left prints on the knife pieces when they picked them up at the

·

crime scene (Tr. pp. 913-914). Stelly's testimony does not indicate whether the only print that was adequate for comparison with Walker's fingerprints was sufficient to make a more general comparative fingerprint search.

In any event, Walker has not shown how he was prejudiced by his counsel's failure to cross-examine Stelly. In fact, the print could have been made by the victim, one of the victim's friends, or someone who handled the knife pieces subsequent to the victim's body and the knife pieces being found. Walker contends such questioning would have indicated to the jury that the fingerprint may have belonged to someone other than Walker, and a fact which was evident from Stelly's testimony that the fingerprint was not Walker's.

Walker also alleges that a deputy at the jail where he was detained prior to trial lifted his print from an item there, then tried unsuccessfully to superimpose his print onto the knife, and accidentally left his own print on the knife; thus, Walker contends the "unknown" print belonged to a deputy sheriff. However, Walker has not submitted any evidence to support his theory that he was the police tampered with the evidence to make him appear guilty, and Officer Stutt's testimony showed how either the deputy's or his own fingerprints could have gotten on the knife. Unsupported, conclusory allegations do not warrant habeas relief. Uresti v. Lynaugh, 821 F.2d 1099, 1103 (5th Cir. 1987); Wilson v. Butler, 813

F.2d 664, 671 (5th Cir.), on rehearing, 825 F.2d 879, 881 (5th Cir. 1987), cert. den., 484 U.S. 1079, 108 S.Ct. 1059, 98 L.Ed.2d 1021 (1988).

Therefore, Walker has not shown that his attorney's failure to cross-examine Stelly constituted a deficient performance. Since Walker has not carried his burden of proving he had ineffective assistance of counsel, this ground for habeas relief is also meritless.

## Conclusion

Based on the foregoing discussion, IT IS RECOMMENDED that Walker's habeas petition be DENIED AND DISMISSED WITH PREJUDICE.

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and Fed.R.Civ.P. 72(b), the parties have **ten (10) business days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within **ten (10) days** after being served with a copy thereof. A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing. Timely objections will be considered by the district judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN TEN (10) BUSINESS DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM**

**ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

THUS DONE AND SIGNED at Alexandria, Louisiana, on this ____ day of June, 2006.

JAMES D. KIRK
UNITED STATES MAGISTRATE JUDGE